**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4788**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

IREK ILGIZ HAMIDULLIN, a/k/a Irek Ilgiz Khamidullah,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond.  Henry E. Hudson, District Judge.  (3:14-cr-00140-HEH-1)

Argued:  December 5, 2017                           Decided:  April 18, 2018

Before WILKINSON, KING, and FLOYD, Circuit Judges.

Affirmed by published opinion.  Judge Floyd wrote the majority opinion in which Judge Wilkinson joined.  Judge Wilkinson wrote a separate concurring opinion.  Judge King wrote a dissenting opinion.

**ARGUED:** Geremy C. Kamens, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellant.  Joseph F. Palmer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** Paul G. Gill, Robert J. Wagner, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Richmond, Virginia, for Appellant.  Jennifer E. Levy, National Security Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Dana J. Boente, United States Attorney, Alexandria, Virginia, Benjamin L. Hatch, Assistant United States Attorney, James P. Gillis, Assistant United States Attorney, Norfolk, Virginia,  Richard D. Cooke,

Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia, for Appellee

———————————

FLOYD, Circuit Judge:

Appellant Irek Hamidullin appeals his conviction for, among other things, providing and conspiring to provide material support to terrorists, in violation of 18 U.S.C. § 2339A, and conspiring and attempting to destroy an aircraft of the United States Armed Forces, in violation of 18 U.S.C. § 32. Hamidullin contends that the district court erred in concluding that he was not entitled to combatant immunity under the Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("Third Geneva Convention" or "Convention"), and that he did not qualify for the common law combatant immunity defense of public authority. Hamidullin also challenges his conviction for violating 18 U.S.C. § 32, arguing that § 32 does not apply to otherwise lawful military actions committed during armed conflicts.

We affirm, concluding that Hamidullin is not entitled to combatant immunity. We also conclude that § 32 clearly applies.

I.

Irek Hamidullin is a former Russian Army officer affiliated with the Taliban and Haqqani Network. He was captured by the Afghan Border Police and American soldiers in the Khost province of Afghanistan in 2009 after he planned and participated in an attack on an Afghan Border Police post at Camp Leyza. He was taken into U.S. custody and held in U.S. facilities in Afghanistan. He was later indicted in the Eastern District of Virginia for acts associated with the attack, first in a twelve-count indictment and later in a fifteen-count second superseding indictment. The charges against him included

3

providing and conspiring to provide material support to terrorists, conspiring and attempting to destroy an aircraft of the United States Armed Forces in violation of 18 U.S.C. § 32, conspiring and attempting to kill an officer or employee of the United States, and conspiring to use a weapon of mass destruction.

Prior to trial, Hamidullin moved for dismissal of the second superseding indictment on the grounds that he qualified for combatant immunity pursuant to the Third Geneva Convention and common law. Hamidullin also moved to dismiss his 18 U.S.C. § 32 charge, arguing that the statute was not intended to apply to lawful military actions.

The district court held an evidentiary hearing on Hamidullin's motions at which experts testified as to the applicability of the Third Geneva Convention and laws of war in Hamidullin's circumstance and as to the structure and practices of the Taliban and the Haqqani Network. Thereafter, the court denied Hamidullin's motion to dismiss. The district court assumed without deciding that in 2009, when the alleged acts took place, the conflict in Afghanistan was an international armed conflict and determined that Hamidullin was not a lawful combatant because neither the Taliban nor the Haqqani Network fell within any of the categories of lawful combatants listed in Article 4 of the Third Geneva Convention. Thus, the district court concluded that, as a matter of law, Hamidullin was not entitled to combatant immunity under the Third Geneva Convention or common law and precluded him from presenting this defense at trial. The district court also determined that the plain language of 18 U.S.C. § 32 embraced unlawful acts in a combat zone.

In August 2015, Hamidullin was convicted by a jury on all charges and sentenced

to multiple life sentences. On appeal, Hamidullin argues that the district court erred in (1) holding that his prosecution was not barred by the doctrine of combatant immunity, as articulated by the Third Geneva Convention and common law, and (2) determining that 18 U.S.C. § 32 applied to his actions. On June 23, 2017, this Court ordered supplemental briefing to address whether the district court possessed jurisdiction to decide, in the first instance, whether Hamidullin qualifies for combatant immunity under the Third Geneva Convention. In particular, we requested briefing on whether the district court's jurisdiction was affected by Army Regulation 190-8—which implements international law relating to detention during armed conflicts. In response, Hamidullin argues that Army Regulation 190-8 requires that this Court vacate his conviction and remand with instructions that he be transferred to the U.S. military for treatment in accordance with Army Regulation 190-8.

## II.

Hamidullin argues he is entitled to combatant immunity under various theories. Accordingly, we begin with a brief discussion of the doctrine of combatant immunity. Combatant immunity is rooted in the customary international law of war and "forbids prosecution of soldiers for their lawful belligerent acts committed during the course of armed conflicts against legitimate military targets." *United States v. Lindh*, 212 F. Supp. 2d 541, 553 (E.D. Va. 2002). Instead, "[b]elligerent acts committed in armed conflict by enemy members of the armed forces may be punished as crimes under a belligerent's municipal law only to the extent that they violate international humanitarian law or are

unrelated to the armed conflict." *Id.* In order to invoke combatant immunity, a combatant must also be lawful, as described below. *Ex parte Quirin*, 317 U.S. 1, 31 (1942) ("Lawful combatants are subject to capture and detention as prisoners of war by opposing military forces. Unlawful combatants are likewise subject to capture and detention, but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.").

The current doctrine of combatant immunity is codified in the Third Geneva Convention. The Third Geneva Convention is one of four international agreements drafted in the wake of World War II to govern the status and treatment of wounded and captured military personnel and civilians in wartime.[1] *See* Adriana Sinclair, *Geneva Conventions*, in 1 *The Oxford Encyclopedia of American Military and Diplomatic History* 414 (Timothy J. Lynch ed., 2013). The Geneva Conventions have been signed and ratified by every country in the world, including the United States. *Id.* The Conventions therefore have the force of law in the United States. U.S. Const. art. VI, cl. 2.

---

[1] The Third Geneva Convention governs the treatment of prisoners of war, whereas the First Geneva Convention addresses the treatment of wounded forces in the field, Geneva Convention for the Amelioration of the Condition of the Wounded in Armies in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31, the Second Geneva Convention addresses the treatment of wounded members of the armed forces at sea, Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85, and the Fourth Geneva Convention addresses the protection of civilians during wartime, Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287.

Article 2 of each of the Geneva Conventions renders the full protections of the Conventions, including combatant immunity, applicable only in international armed conflicts between signatories of the Conventions. Third Geneva Convention, art. 2. ("[T]he present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties"). If Article 2 is applicable, then the Third Geneva Convention provides that lawful combatants who are captured in such a conflict are considered prisoners of war (POWs). The categories of combatants qualifying as lawful are listed in Article 4 of the Convention. Two of these categories are relevant in this case:

> A. Prisoners of war, in the sense of the present Convention, are persons belonging to one of the following categories, who have fallen into the power of the enemy:
>
> > (1) . . . .
> > (2) Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil the following conditions:
> > > (a) that of being commanded by a person responsible for his subordinates;
> > > (b) that of having a fixed distinctive sign recognizable at a distance;
> > > (c) that of carrying arms openly;
> > > (d) that of conducting their operations in accordance with the laws and customs of war.
> > (3) Members of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power.

7

*Id.* art. 4(A)(2)–(3). Under the Convention, POWs are granted combatant immunity.[2] *See id.* art. 87 (stating that POWs "may not be sentenced . . . to any penalties except those provided for in respect of members of the armed forces of the [detaining] Power who have committed the same acts"); *id.* art. 102 ("A prisoner of war can be validly sentenced only if the sentence has been pronounced by the same courts according to the same procedure as in the case of members of the armed forces of the Detaining Power, and if, furthermore, the provisions of the present Chapter have been observed."). If there is doubt as to whether a captured combatant is a lawful combatant and thus entitled to POW status, Article 5 of the Convention requires that the captured person be treated as a POW until their status is determined by a "competent tribunal." *Id.* art. 5 ("Should any doubt arise . . . such persons shall enjoy the protection of the [Third Geneva] Convention until such time as their status has been determined by a competent tribunal."). The text of the Convention is silent as to what qualifies as a competent tribunal.

When a conflict is not an international conflict between Geneva Convention signatories, at least one article of the Geneva Conventions still applies. Article 3 of each Convention provides that in an "armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum," certain provisions, including protecting "[p]ersons taking no active part in the hostilities," and refraining from "the passing of sentences and the

---

[2] To the extent they exist, any differences between lawful combatants and POWs are immaterial to our discussion here. Accordingly, for ease of reference, we use the terms POW and lawful combatant interchangeably.

carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *Id.* art 3; *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 629–30 (2006). Thus, Article 3 allows for combatants captured during non-international conflicts to face trial and judgment for their actions as long as they are tried in the opposing force's country's "regularly constituted court." *Id.*; *see also* 1 Int'l Comm. of Red Cross (ICRC), *Customary International Humanitarian Law* 354–55 (2005) (stating that pursuant to Article 3 of the Third Geneva Convention, captured combatants can be sentenced in a "regularly constituted court" that is "established and organised in accordance with the laws and procedures already in force in a country.")[3].

The Supreme Court has determined that Article 2 of the Third Geneva Convention applies when a conflict "involve[s] a clash between nations," whereas Article 3 "affords some minimal protection, falling short of full protection under the Conventions, to individuals associated with neither a signatory nor even a nonsignatory 'Power' who are involved in a conflict." *See Hamdan*, 548 U.S. at 628–29 (discussing the conflict in Afghanistan between the U.S. and al-Qaeda and applying Article 3). *See also* ICRC, *Commentary on the Additional Protocols to the Geneva Conventions of 12 August 1949* 1350–51 (1987) (discussing the Conventions' distinction between international and non-international conflicts and explaining that "in a non-international armed conflict the legal

---

[3] Although non-binding, the ICRC's interpretation of the Geneva Conventions has been treated as persuasive by the Supreme Court. *Hamdan*, 548 U.S. at 632.

status of the parties involved in the struggle is fundamentally unequal. Insurgents (usually part of the population), fight against the government in power").

Here, Hamidullin claims that he cannot be tried in a United States criminal court because he is a POW entitled to combatant immunity under the Third Geneva Convention. We now turn to that inquiry.

III.

As a threshold matter, we must consider whether the district court had jurisdiction[4] to decide in the first instance whether Hamidullin qualified as a POW under the Third Geneva Convention, or whether Army Regulation 190-8 requires that his status first be determined by a military tribunal.

Army Regulation 190-8 controls the Army, Navy, Air Force, and Marine Corps approach to the treatment and care of enemy prisoners of war and other detainees. Army Reg. 190-8, i. The regulation articulates a general policy that "[a]ll persons taken into custody by U.S. forces will be provided with the protections of the [Third Geneva Convention]," *id.* 1–5(a)(2), and that "[i]n accordance with Article 5 [of the Convention], if any doubt arises as to whether a person . . . belongs to any of the categories enumerated

---

[4] Pursuant to this Court's request for supplemental briefing, Hamidullin and the government use the term "jurisdiction" to describe the impact of Army Regulation 190-8 on Article III courts. However, Hamidullin does not argue that the district court lacked subject matter jurisdiction. Instead, he claims that there are prerequisite steps that the government ought to have completed prior to his criminal prosecution—in this case an Army Regulation 190-8 tribunal.

10

in Article 4, . . . such persons shall enjoy the protection of the [Third Geneva] Convention until such time as their status has been determined by a competent tribunal," *id.* 1–6(a). Army Regulation 190-8 further states:

> A competent tribunal shall determine the status of *any* person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists.

*Id.* 1–6(b) (emphasis added). Army Regulation 190-8 defines a competent tribunal as a tribunal "composed of three commissioned officers." *Id.* 1–6(c).

Hamidullin argues that Army Regulation 190-8 limits the ability of Article III courts to hear criminal claims against him. He contends that, like in the context of the federal prosecution of juveniles and hate crimes, when the Attorney General must make a certification to the district court demonstrating the unavailability or inappropriateness of state court prosecution prior to federal prosecution, the government must comply with Army Regulation 190-8 prior to proceeding with the criminal prosecution of captured combatants. *See* 18 U.S.C. § 5032; 18 U.S.C. § 249(b). He asserts that Army Regulation 190-8 requires that any doubt about the applicability of combatant immunity to captured combatants be resolved in the first instance by a competent tribunal composed of three military officers. Because no such tribunal determined his status, Hamidullin contends that he is immune from criminal prosecution in civilian court and should be remanded to the custody of the U.S. military. This argument is unpersuasive.

A.

11

Army Regulation 190-8's general implementation of the Third Geneva Convention does not impact the district court's jurisdiction in this case. Army Regulation 190-8 confirms that persons taken into custody by U.S. forces will be provided Geneva Convention protections. The regulation implements Article 5 of the Convention and provides that if there is doubt as to whether a detained person is a POW, as defined by the Third Geneva Convention, the detainee "shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal." Army Reg. 190-8, 1–6(a). Critically, however, Army Regulation 190-8, in implementing Article 5, is also restricted by Article 5's applicability. Article 2 of the Convention provides that the Article 5 determination of POW status by a competent tribunal is only applicable in cases of international armed conflict between Convention signatories. Consequently, Army Regulation 190-8, by its own terms, only provides that POW status is determined by a competent tribunal in cases of international armed conflict. We conclude, however, that at the time of Hamidullin's offense, the conflict in Afghanistan was not an international armed conflict, and therefore that the Army Regulation 190-8 and the Article 5 requirement that POW status be determined by a competent tribunal does not apply.

The conflict in Afghanistan began in 2001 as an international armed conflict arising between two or more Third Geneva Convention signatories—it was a conflict between the United States and its coalition partners on one side, and the Taliban-controlled Afghan government on the other. *See* J.A. 265–66. Shortly thereafter, in 2002, the Taliban lost control of the government and was replaced by a government led

12

by Hamid Karzai. *See* J.A. 270. The United States and its coalition partners remained in Afghanistan at the request of this new government, assisting it in combating the continued Taliban insurgency. J.A. 311–12. Thus, by 2009, the conflict in Afghanistan had shifted from an international armed conflict between the United States and the Taliban-run Afghan government to a non-international armed conflict against unlawful Taliban insurgents.

The Pictet Commentary, which the Supreme Court has found instructive in interpreting the Third Geneva Convention in *Hamdan*, 548 U.S. at 619–20, supports the conclusion that in 2009, the conflict in Afghanistan was non-international. The Pictet Commentary explains that Article 4(A)(3) of the Convention, which defines POWs to include "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power," Third Geneva Convention, art. 4(A)(3), was a response to the refusal of certain states to recognize the combatant immunity of French followers of General Charles de Gaulle fighting during World War II, ICRC, *Commentary to Geneva Convention III Relative to the Treatment of Prisoners of War* 62 (J. Pictet ed., 1960) ("[Article 4] must be interpreted, in the first place, in the light of the actual case which motivated its drafting—that of the forces of General de Gaulle which were under the authority of the French National Liberation Committee."). Article 4(A)(3) was drafted to afford POW protections to combatants who, like the Free French led by General de Gaulle, continued to engage in armed conflict even after a new government had been installed in their country and reached an armistice with a once-adversary. *Id.* at 61–63. However, Article 4(A)(3) is not without limit; indeed, the

13

drafters of the Third Geneva Convention feared that an overly broad interpretation of Article 4(A)(3) would be "open to abusive interpretation" and lead "to the formation of armed bands." *Id.* at 62, 63. The Pictet Commentary, therefore, makes clear that the installation of a new government by an invading power is not enough to convert a conflict from international to non-international. Rather, some level of international recognition is required for the conflict to remain an "international armed conflict." *Id.* at 63 ("It is not expressly stated that this Government or authority must, as a minimum requirement, be recognized by third States, but *this condition is consistent with the spirit of the provision*, which was founded on the specific case of the forces of General de Gaulle." (emphasis added)). In the case of the Free French, the ousted government led by General de Gaulle was recognized by the Allied forces. Conversely, by the time Hamidullin was captured, the Taliban had been removed from power for eight years and *no* country recognized the Taliban as the legitimate government of Afghanistan. J.A. 275–76 (explaining that the last country recognizing the Taliban government withdrew its recognition within months of 9/11). Thus, the Pictet Commentary suggests that in 2009, the conflict in Afghanistan was a non-international armed conflict for the purposes of the Convention.

The International Committee of the Red Cross and the executive branch of the United States government have reached this same conclusion. *See* ICRC, *International Humanitarian Law and the Challenges of Contemporary Armed Conflicts* 10 (2011) ("As the armed conflict does not oppose two or more states, i.e. as all the state actors are on the same side, the conflict must be classified as non-international, regardless of the

14

international component, which can at times be significant. A current example is the situation in Afghanistan (even though that armed conflict was initially international in nature)."); ICRC, *International Humanitarian Law and the Challenges of Contemporary Armed Conflicts* 7 (2007) ("This conflict [against the Taliban and Al-Qaeda] is non-international . . . because it is being waged with the consent and support of the respective domestic authorities and does not involve two opposed States."); *see also* The White House, *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* 19, 32 (2016) (stating that the United States is currently engaged only in non-international armed conflicts). Common sense agrees. If the conflict in Afghanistan was originally an international armed conflict occurring between two "High Contracting Parties"—the United States and the Afghan government—the conflict cannot remain international when the conflict between the recognized Afghan government and the United States has ceased. Accordingly, the provision in Army Regulation 190-8 directing that POW status be determined in accordance with Article 5 is inapplicable, and Hamidullin's argument that these provisions require a competent tribunal to determine his POW status must fail.

Instead, because we conclude that the conflict in Afghanistan was non-international at the time of Hamidullin's offense, the protections of Article 3 of the Convention apply. Under Article 3, however, there is no provision entitling combatants captured during non-international conflicts to POW status or the resulting combatant immunity. Therefore, there is no process by which Hamidullin is entitled to a determination of whether he is a POW, as no POW status exists under Article 3, and,

15

consequently, combatant immunity cannot be granted.

Pursuant to Article 3, Hamidullin can be sentenced in a "regularly constituted court" that is "established and organised in accordance with the laws and procedures already in force in a country." 1 ICRC, *Customary Int'l Humanitarian Law* 355 (2005) (interpreting Third Geneva Convention, art. 3). A U.S. federal district court is one such court. *See* 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."); *Hamdan*, 548 U.S. at 632, 635 (clarifying that "Article 3 [of the Conventions] . . . tolerates a great degree of flexibility in trying individuals captured during armed conflict; its requirements are general ones, crafted to accommodate a wide variety of legal systems"). Thus, the district court had jurisdiction to adjudicate Hamidullin's case irrespective of Army Regulation 190-8's invocation of Article 5 of the Convention.

B.

Hamidullin also argues that Army Regulation 190-8's statement that "[a] competent tribunal shall determine the status of *any* person not appearing to be entitled to prisoner of war status . . . who asserts that he or she is entitled to treatment as a prisoner of war" entitles him to a competent tribunal regardless of whether the 2009 conflict was international. *Id.* 1–6(b) (emphasis added). We disagree.

To be sure, military regulations have the force of law. *Standard Oil Co. of Cal. v. Johnson*, 316 U.S. 481, 484 (1942) ("War Department regulations have the force of

16

law."); *United States v. Eliason*, 41 U.S. (16 Pet.) 291, 302(1842) ("[R]ules and orders publicly promulged [sic] through [the secretary of war] must be received as the acts of the executive, and as such, be binding upon all within the sphere of his legal and constitutional authority."). However, both the Supreme Court and this Court have made clear that military law does not govern our Article III jurisprudence. *See United States v. Rendon*, 607 F.3d 982, 990 (4th Cir. 2010) ("[M]ilitary law 'is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment.'" (quoting *Burns v. Wilson*, 346 U.S. 137, 140 (1953))). Consequently, a regulation such as Army Regulation 190-8, 1–6(b), cannot preclude district court jurisdiction when doing so contravenes Congress's grant of jurisdiction to the judiciary.

Hamidullin's interpretation of Army Regulation 190-8, 1–6(b), would allow an internal executive branch regulation to strip Article III courts of their statutorily granted jurisdiction. At the time of his trial, Hamidullin was in civilian custody and under indictment for civilian crimes over which Congress has granted exclusive jurisdiction to Article III district courts. *See* 18 U.S.C. § 3231. During his civilian criminal proceeding Hamidullin raised a defense—combatant immunity—that is inextricably tied up in questions of treaty interpretation. This defense does not deprive the district court of its authority to hear Hamidullin's case, as there can be no question that it is the role of the judiciary, not the executive, to interpret treaties. To quote the Supreme Court in *Sanchez-Llamas v. Oregon*:

> Under our Constitution, "[t]he judicial Power of the United States" is "vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Art. III, § 1. That "judicial

17

Power . . . extend[s] to . . . Treaties." *Id.* § 2. And, as Chief Justice Marshall famously explained, that judicial power includes the duty "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). If treaties are to be given effect as federal law under our legal system, determining their meaning as a matter of federal law "is emphatically the province and duty of the judicial department," headed by the "one supreme Court" established by the Constitution. *Id.*; see also *Williams v. Taylor*, 529 U.S. 362, 378–379 (2000) (opinion of Stevens, J.) ("At the core of [the judicial] power is the federal courts' independent responsibility— independent from its coequal branches in the Federal Government, and independent from the separate authority of the several States—to interpret federal law").

548 U.S. 331, 353–54 (2006). Determining the meaning of the Third Geneva Convention as a matter of federal law "is emphatically the province and duty of the judicial department," *Marbury*, 5 U.S. (1 Cranch) at 177, and remanding this case to the executive branch to determine the Convention's meaning and applicability to Hamidullin in the first instance would be an abdication of "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

Of course, the executive may engage in the interpretation of treaties in order to implement them into its own internal procedures and regulations. Such interpretations are "entitled to great weight" and can inform the judiciary's own interpretations. *Abbott v. Abbott*, 560 U.S. 1, 15 (2010) (discussing the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 24, 1980, T.I.A.S. No. 11670); *see also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982). Here, the Executive Branch has used Army Regulation 190-8 to implement the protections of the Third Geneva Convention. Additionally, the executive has explicitly expressed its interpretation of the

18

Third Geneva Convention with regards to the Taliban. In 2002, when the conflict in Afghanistan was still considered an international armed conflict and, thus, Article 4 of the Convention applied to determine whether a combatant qualified as a POW, President George W. Bush determined that Taliban detainees did not qualify as POWs because they were unlawful combatants. Memorandum of President George W. Bush to the Vice President, et. al. (Feb. 7, 2002); *see also Hamdan v. Rumsfeld*, 415 F.3d 33, 43 (D.C. Cir. 2005), *rev'd on other grounds*, 548 U.S. 557 (2006) ("The President found that Hamdan was not a prisoner of war under the Convention. Nothing in [Army Regulation 190-8], and nothing [petitioner] argues, suggests that the President is not a 'competent authority' for these purposes.").

Hamidullin asks us to provide a three-member military tribunal with the authority to displace the president's interpretation of the Convention. In arguing that Army Regulation 190-8, 1–6(b) applies even if at the time of his offense the conflict in Afghanistan was non-international, Hamidullin requests that we remand him to military custody to allow a tribunal to determine whether the Third Geneva Convention provides him with combatant immunity. This will necessarily involve a reconsideration of President Bush's interpretation of the Convention, as the Convention only extends combatant immunity to combatants involved in international armed conflicts. Accordingly, Hamidullin not only asks this Court to abdicate our duty to decide cases properly within our jurisdiction, but also asks us to ignore the legal determination already made by the President of the United States, and to instead authorize a panel of three mid-level, non-lawyer military officers to usurp our authority and responsibility. *See* Status of

19

Taliban Forces Under Article 4 of the Third Geneva Convention of 1949, 26 Op. O.L.C. 1, 9 (2002). (stating that Article 5 "[t]ribunals are . . . designed to determine whether a particular set of facts falls within one of the Article 4 categories; they are not intended to be used to resolve the proper interpretation of those categories."). Moreover, remanding this case to a military tribunal to make a legal determination that the Commander-in-Chief has already made could lead to an inconsistent application of the laws of war, would undermine the United States and its partners' current application of the legal framework for non-international armed conflicts in Afghanistan, and, perhaps most troubling, would violate separation of powers principles by conferring our responsibility to hear cases properly within our jurisdiction upon a three-member military tribunal.[5] We cannot allow Hamidullin's interpretation of Army Regulation 190-8 to upend our system of governance. It is the responsibility of this Court—not of a three-member panel of military officers—to decide the lawfulness of the executive's interpretation. *See Sanchez-Llamas*, 548 U.S. at 353–54.[6]

---

[5] Hamidullin responds that allowing a military tribunal to determine his status is consistent with the doctrine of primary jurisdiction. Primary jurisdiction is a prudential limit which takes advantage of agency expertise by allowing agencies to make determinations in the first instance when a case implicates issues not within the "conventional experience of judges." *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996). But it is inappropriate to invoke the doctrine of primary jurisdiction when the Commander-in-Chief has already answered the question Hamidullin seeks to submit to the Army.

[6] The dissent disagrees as to whether the Third Geneva Convention questions underlying Hamidullin's POW claim are properly decided by the courts or the executive in the first instance. Specifically, the dissent asserts that we should "remand this matter for the limited purpose of the Executive's consideration and explanation of Hamidullin's (Continued)

Consequently, we conclude that the district court had jurisdiction to determine whether Hamidullin qualifies as a POW and was entitled to combatant immunity under the Convention, irrespective of Army Regulation 190-8. We therefore decline to remand Hamidullin to military custody, and turn to the merits of his combatant immunity defenses.

IV.

Hamidullin argues he is entitled to combatant immunity pursuant to the Third Geneva Convention and common law. We review the district court's factual findings for clear error, and its legal determinations de novo. *United States v. Washington*, 398 F.3d 306, 310 (4th Cir. 2005).

A.

To be entitled to combatant immunity, the Third Geneva Convention requires that a combatant (1) be captured during an international armed conflict, Third Geneva

---

POW status," dissent at 33, and that "unless and until the Executive resolves his POW claim, Hamidullin should be treated in accordance with the Third Geneva Convention and Army Regulation 190-8," *id.* at 70-71. Notwithstanding that this remand would place Hamidullin in limbo pending a determination from the executive that neither he nor the courts have the authority to compel, the dissent unconvincingly attempts to limit the judiciary's authority to interpret the Convention to reviewing the executive's interpretations. The executive certainly has the authority to clarify its position on the Convention questions underlying Hamidullin's claim and to deem him a POW—even outside of the Convention and Army Regulation 190-8. However, the judiciary likewise has the authority and the responsibility to interpret those documents, including reviewing whatever guidance the executive has provided, to resolve Hamidullin's claim.

21

Convention, art. 2, and (2) be a lawful combatant—in other words, the combatant must belong to one of the Article 4 categories defining POW's, *id.* art. 4. Article 4 lists six categories of lawful combatants, but only two categories, Article 4(A)(2) and (A)(3), are relevant here. Article 4(A)(2) provides that members of militias belonging to a party to the conflict are lawful combatants entitled to POW status so long as they are commanded by a person responsible for subordinates, carry a "fixed distinctive sign," carry arms openly, and operate in accordance with the laws of war. *Id.* art. 4(A)(2). Article 4(A)(3) provides that "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power" are likewise POWs. *Id.* art. 4(A)(3).

Below, the district court assumed, without deciding, that the conflict in Afghanistan in 2009 was international and determined that neither the Taliban nor the Haqqani Network fit into an Article 4 category. It held that the Taliban and Haqqani Network most closely resembled a "militia" or "organized resistance movement" as described in Article 4(A)(2), but that neither organization fulfilled the criteria of Article (4)(2). Specifically, the district court found that neither organization has a fixed, distinctive sign recognizable at a distance, carries arms openly, or conducts operations in accordance with the laws and customs of war. *See id.* art. 4(A)(2).[7]

---

[7] On appeal, Hamidullin does not argue that members of the Haqqani Network, a Taliban-affiliated group of militants that conducts insurgent activity in Afghanistan, qualify for combatant immunity under the Third Geneva Convention or common law. Accordingly, we address only the status of captured Taliban fighters.

Hamidullin does not identify a clear error in the district court's factual findings, and makes no claim that the Taliban satisfy the criteria set forth in Article 4(A)(2). Instead, he contends he is entitled to POW status under Article 4(A)(3), which covers "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power." *Id.* art. 4(A)(3). Unlike the criteria for militia in Article 4(A)(2), Article 4(A)(3) contains no conditions that groups must fulfill in order to be entitled to POW status; membership in a regular armed force expressing allegiance to a government not recognized by the detaining power is the only enumerated requirement. Hamidullin contends that because the Third Geneva Convention does not expressly incorporate the Article 4(A)(2) criteria into Article 4(A)(3), he is entitled to POW status regardless of whether the Taliban satisfies the Article 4(A)(2) criteria.

The difficulty with Hamidullin's argument is that, as discussed above, we hold that the conflict in Afghanistan was not an international armed conflict. As a result, irrespective of whether Taliban fighters are entitled to POW status pursuant to Article 4(A)(3), Hamidullin is not entitled to combatant immunity because the protections of Article 3 (governing non-international conflicts), rather than Article 2 (governing international conflicts), apply. Article 3 only requires that Hamidullin be tried "by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Third Geneva Convention, art. 3. The U.S. federal district courts are "established and organised in accordance with the laws and procedures already in force" in the United States. *See* 1 ICRC, *Customary International*

23

*Humanitarian Law* 355 (2005); 18 U.S.C. § 3231. Accordingly, the district court did not err in determining that Hamidullin was properly tried in a regularly constituted American court.

B.

In the alternative, Hamidullin argues that even if he does not qualify for combatant immunity under the Third Geneva Convention, he is eligible for common law combatant immunity as an enemy soldier fighting for a rival sovereign. He frames this defense as a public authority defense, citing *Dow v. Johnson* and other post-Civil War jurisprudence. 100 U.S. 158, 165 (1879) ("[F]rom the very nature of war, the tribunals of the enemy must be without jurisdiction to sit in judgment upon the military conduct of the officers and soldiers of the invading army."); *see also Coleman v. Tennessee*, 97 U.S. 509, 515 (1879) ("Officers and soldiers of the armies of the Union were not subject during the war to the laws of the enemy, or amenable to his tribunals for offences committed by them."). Hamidullin argues that just as defendants who act in objectively reasonable reliance on the authority of a government official are immune from criminal liability, *see United States v. Fulcher*, 250 F.3d 244, 252–53 (4th Cir. 2001), soldiers in armed conflict are immune from criminal liability when they act by virtue of the direction of a belligerent party. Typically, however, the public authority defense looks to whether the defendant's actions were sanctioned by a U.S. official, as foreign officials do not have authority to authorize violations of U.S. criminal law. *See* 1 Charles E. Torcia, *Wharton's Criminal Law* § 41 (15th ed. 2015) ("The fact that a crime committed in time of peace was

24

committed under the directions of the authority of a foreign government is no defense."). Nonetheless, Hamidullin asserts that "immunity from ordinary criminal liability applies without distinction between soldiers who fight on behalf of a State and opposing forces who assert a rival claim to sovereign authority." Appellant Br. 35. We disagree.

The Third Geneva Convention is the governing articulation of lawful combatant status. The principles reflected in the common law decisions cited by Hamidullin were refined and collected in 20th century efforts to codify the international law of war that resulted in the Third Geneva Convention. Just as a statute preempts common law when Congress speaks directly to the question, *see e.g.*, *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 315 (1981), a self-executing treaty like the Third Geneva Convention would similarly preempt common law if the treaty speaks directly to the question. The Third Geneva Convention explicitly defines the category of individuals entitled to POW status, and concomitantly, combatant immunity. Third Geneva Convention, art. 4. As such, the Third Geneva Convention's definition of lawful and unlawful combatants is conclusive.

Moreover, Hamidullin's broad framing of common law combatant immunity would extend immunity far beyond the Third Geneva Convention, to every person acting on behalf of an organization that claims sovereignty. For example, it could supply a claim of immunity to terrorists operating on behalf of the Islamic State, which itself claims sovereignty. We decline to broaden the scope of combatant immunity beyond the carefully constructed framework of the Geneva Convention. The Convention represents an international consensus on the norms of treatment of prisoners, a consensus that would

be eviscerated if common law principles were interpreted as superseding. Because Hamidullin does not qualify for combatant immunity pursuant to the Third Geneva Convention, he likewise does not qualify for the common law defense of public authority.

V.

Last, Hamidullin challenges his conviction for conspiring and attempting to destroy a U.S. military aircraft in violation of 18 U.S.C. § 32(a). Section 32(a) states that "[w]hoever willfully—(1) sets fire to, damages, destroys, disables, or wrecks any aircraft in the special aircraft jurisdiction of the United States" shall be imprisoned not more than twenty years. 18 U.S.C. § 32(a). The special jurisdiction of the United States includes "an aircraft of the armed forces of the United States" in flight. 49 U.S.C. § 46501(2)(B). Section 32(b) criminalizes the damage or destruction of "civil aircraft registered in a country other than the United States." The district court held that the plain language of § 32(a) applies to unlawful acts even when committed in a combat zone.

Hamidullin argues that Congress did not intend to apply § 32 to military personnel whose attacks on aircraft are accepted under the laws of armed conflict. To support this contention, he relies on a memorandum from the Office of Legal Counsel which analyzed § 32(b) and reasoned that § 32(b) should not be construed to "have the surprising and almost certainly unintended effect of criminalizing actions by military personnel that are lawful under international law." United States Assistance to Countries that Shoot Down Civil Aircraft Involved in Drug Trafficking, 18 Op. O.L.C. 148, 164 (1994).

26

We conclude that Hamidullin's argument fails because even Hamidullin's preferred construction of congressional intent does not preclude application of the statute in this case. He claims that Congress did not intend § 32 to apply to the actions of "military force" that are lawful under international law. However, as described above, Hamidullin was not a lawful combatant and his conduct was not lawful under the Third Geneva Convention. Hence, the district court did not err in determining that the plain language of § 32(a) applied to Hamidullin's conduct. Here, Hamidullin was convicted of attempting to fire anti-aircraft weapons at U.S. military helicopters. Given Hamidullin's status as an unlawful combatant, that attack falls under the plain language of 18 U.S.C. § 32(a).

\* \* \*

We do not take our duty to respect and comply with the tenets of international law lightly. This is especially true when, as here, our interpretation of that responsibility has the potential to seriously impact the treatment of persons captured during armed conflicts. Nonetheless, for the foregoing reasons, it is clear to us that neither the Third Geneva Convention nor U.S. Army regulations grant Hamidullin immunity from criminal prosecution in an Article III court. Moreover, the text of § 32(a) clearly applies to these facts. Accordingly, the judgment of the district court is

*AFFIRMED.*

WILKINSON, Circuit Judge, concurring:

I am pleased to concur in Judge Floyd's fine opinion. I write separately only to underscore both the folly and the hazard of Hamidullin's jurisdictional challenge. Hamidullin urges us to hold that a single Army regulation (AR 190-8) stripped the district court in this case of jurisdiction to conduct in the first instance his criminal trial. But an insurmountable series of obstacles stands in the way of any such ruling. *See* Maj. Op. at 17-20. A military regulation cannot overcome: an act of Congress granting the district courts jurisdiction over "all offenses against the laws of the United States," 18 U.S.C. § 3231; the Commander-in-Chief's declaration that "Taliban detainees are unlawful combatants and, therefore, do not qualify as prisoners of war" under the Third Geneva Convention, *see* White House Memorandum, Humane Treatment of Taliban and al Qaeda Detainees 2 (Feb. 7, 2002); and the uniform legal framework applied by our allies—and heretofore, our own government—whereby Taliban fighters may be prosecuted as unlawful combatants in civilian courts.[1]

---

[1] Our friend in dissent longs for "a clear statement from the Executive Branch" on whether Taliban and Haqqani fighters should be accorded POW status. Dissent at 32. We have many. The President stated very clearly in 2002 that the answer is no. And the government's briefing in this case states very clearly that its position remains the same. *See* Br. of U.S. at 27-41; Second Supp. Br. of U.S. at 2. If the dissent really wishes a clear statement, it has only to look underfoot. The clearest statement imaginable that Taliban and Haqqani fighters should not be accorded POW status is the prosecution of Hamidullin that began in 2014 and the conviction of Hamidullin defended by the government on appeal. Actions may or may not speak louder than words. But here we are fortunate to have both.

The Executive Branch is free, of course, to change its position at any time. But it has chosen not to do so. The President's declaration that the Taliban are unlawful enemy
(Continued)

28

Any conclusion to the contrary would defy logic. And it would turn on its head "the American constitutional tradition" of civilian control over the military. *Greer v. Spock*, 424 U.S. 828, 839 (1976). The Supreme Court has emphasized that federal courts have a "virtually unflagging obligation" to exercise the jurisdiction that Congress has given them. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Allowing a military status determination under AR 190-8 to override the determination of the President and to both halt and overturn criminal prosecutions brought under duly enacted laws of Congress would fly in the face of our Constitution's guarantee that military judgments will be "subject *always* to civilian control of the Legislative and Executive Branches." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973).

Giving AR 190-8 precedence in such a way is not only incorrect as a matter of law; it would also have far-reaching consequences. The President's status declaration was

---

combatants has never been rescinded, superseded, or modified. In fact, its relevance could not have been diminished in 2009, the year Hamidullin was captured attacking U.S. aircraft. For by that time, the Taliban had been overthrown and the conflict had become a non-international armed conflict. And our allies have recognized that fact and acted accordingly. The dissent's appetite for an additional "clear statement" will do nothing but sow confusion in a delicate matter of international relations and prolong this case indefinitely. Perhaps the dissent would heed an additional statement if it received one under its indefinitely elongated timetable. Or perhaps it would ignore it as it has every clear statement the Executive Branch has already offered.

Finally, the dissent's proffer of the truism that the government is not always right adds absolutely nothing to the question in this case of whether the Taliban should be accorded POW status. All the smoke and mirrors fail to change in even minor particular the consistent view of all post-9/11 administrations, and of America's allies in the Afghan fight, that the Taliban collectively are unlawful enemy combatants and not entitled to the broad jurisdictional immunity from Article III courts that Hamidullin now claims.

29

a collective, not an individual, one. Empowering different panels of military officers to determine case by case whether Taliban fighters are entitled to POW status would throw the entire concept of a collective judgment overboard and would result in the disparate treatment of similarly situated detainees. And it would hamstring our country in its ability to approach armed conflicts in a unified fashion. It would also undermine the consistent practice of both the United States and its allies to uniformly treat Taliban fighters as insurgents who lack any claim to the Third Geneva Convention's combatant immunity defense. But perhaps most alarmingly, allowing status determinations under AR 190-8 to control here would threaten to elevate every band of terrorists around the world to near nation-state status and, in so doing, to extend the protections of the Third Geneva Convention to those who both regularly and flagrantly violate its dictates.

For years, the aim of Taliban fighters was to get into the civilian courts. When those courts proved also capable of imposing just punishment, Taliban defendants sought to discredit them too. As Judge Floyd's cogent opinion demonstrates, this whole exercise is a shell game designed to play one part of American governance against another. An affirmance here respects the proper roles of our President, our Congress, our courts, our military, and the international alliance against the worldwide scourge of terrorism in which our nation plays such a crucial part.

KING, Circuit Judge, dissenting:

Whether Irek Hamidullin qualifies as a prisoner of war (a "POW") under the Third Geneva Convention implicates two difficult questions with great potential repercussions for international relations and the safety and security of our military personnel abroad: (1) whether the war in Afghanistan against the Taliban was an international armed conflict within the meaning of the Third Convention's Article 2 when Hamidullin was captured by the U.S. Army in late 2009; and (2) whether Hamidullin satisfies one of the categories of POWs articulated in the Convention's Article 4. Hamidullin and the Government mutually left those questions to be answered by the district court — simply presenting evidence and argument in support of their respective theories — without asserting that either issue had already been conclusively determined by the Executive Branch and without contesting the district court's authority to decide the issues in the first instance. Thereafter, the district court opted to avoid the Article 2 question (recognizing that it "may elude a definitive answer"), proceeded to its own Article 4 analysis, and concluded that Hamidullin is not eligible for POW status. *See United States v. Hamidullin*, 114 F. Supp. 3d 365, 387 (E.D. Va. 2015).

Only later, after we raised concerns in this appeal about whether the Third Convention questions are initially for the Executive or the Judiciary, did the parties change stances on the district court's power to dispose of Hamidullin's POW claim. Hamidullin has since been firm that the Article 2 international armed conflict question is for the courts, but that, regardless of the status of the war, he is entitled to have a military tribunal assess his Article 4 eligibility for POW status pursuant to Army Regulation 190-

31

8. Meanwhile, the Government has wavered between arguing that the Executive Branch has rendered unassailable determinations on the relevant Third Convention issues and contending that those issues should be decided by the courts, albeit with some deference to the Executive's views.

Indeed, the Government has asserted both that the Executive's "determinations constitute a classic exercise of the President's war powers and his authority over foreign affairs," *see* Suppl. Br. of Appellee 13, and that "the judicial branch must render its own decision on the availability of immunity to criminal charges here," *see* Second Suppl. Br. of Appellee 14. With respect to each premise, the Government invokes a statement issued by President George W. Bush on February 7, 2002 (the "2002 Presidential Statement"), which deemed the war against the Taliban to be an Article 2 international armed conflict but purported to categorically exclude Taliban fighters from POW status under Article 4. According to the Government, the Executive explicitly — or maybe just implicitly — abandoned the 2002 Presidential Statement's Article 2 judgment by 2009. The Government insists, however, that the Executive continues to adhere to the Statement's sweeping Article 4 ruling — notwithstanding widespread condemnation of that ruling, including criticism from the Supreme Court and the Government's own expert witness.

In my view, these circumstances demand a clear statement from the Executive Branch on whether Hamidullin should be accorded POW status and, if not, an explanation as to why not. Contrary to the Government, the Executive has not already rendered Article 2 and Article 4 determinations to which we can or should defer. Yet I

32

agree with the Government insofar as it contends the Third Convention questions are initially for the Executive, not the courts. Consequently, I would remand this matter for the limited purpose of the Executive's consideration and explanation of Hamidullin's POW status. Such a remand would not necessarily include the military tribunal sought by Hamidullin. Perhaps instead, the President would pronounce that the war against the Taliban was not an Article 2 international armed conflict at the time of Hamidullin's capture in late 2009. Or perhaps the President would endorse the 2002 Presidential Statement's categorical Article 4 ruling and proclaim its continuing applicability. Or perhaps the President would elect to bestow POW protections upon Hamidullin, regardless of Article 2 and Article 4, in an effort to obtain reciprocal treatment of U.S. forces. Whatever the Executive would decide, we would have the opportunity for an informed and appropriate review upon this matter's return to our Court.

My distinguished colleagues, however, reckon that the Third Convention questions are a matter of treaty interpretation primarily for the Judiciary, not the Executive Branch. *See ante* at 17-18 (explaining that "there can be no question that it is the role of the judiciary, not the executive, to interpret treaties," though "the executive may engage in the interpretation of treaties in [certain circumstances and thereby] inform the judiciary's own interpretations"). Like the district court, my friends resolve the conflicting evidence and authorities to confidently declare that Hamidullin cannot be a POW. Nonetheless, the panel majority takes a tack different from the district court's. That is, the majority makes an original determination that the war against the Taliban was no longer an Article 2 international armed conflict by 2009. *See id.* at 12 ("We conclude,

33

however, that at the time of Hamidullin's offense, the conflict in Afghanistan was not an international armed conflict, and therefore that the Army Regulation 190-8 and the [Third Convention] requirement that POW status be determined by a competent tribunal does not apply."). Additionally, the majority rejects Hamidullin's argument that, regardless of the status of the war, Regulation 190-8 entitles him to have his Article 4 eligibility for POW status determined by a military tribunal. According to the majority, agreeing with Hamidullin on that point would strip the federal courts of the jurisdiction to interpret treaties, as well as the jurisdiction to adjudicate crimes, and would flout the 2002 Presidential Statement's Article 4 ruling. *See id.* at 19-20 ("Hamidullin not only asks this Court to abdicate our duty to decide cases properly within our jurisdiction, but also asks us to ignore the legal determination already made by the President of the United States . . . . We cannot allow Hamidullin's interpretation of Army Regulation 190-8 to upend our system of governance.").

With all respect for my good friends, their analysis is unsound and their forecast of constitutional chaos is unfounded. To truly respect the separation of powers, we could and should remand this matter for the Executive Branch's determination of the Third Convention issues, not resolve those questions ourselves. Unfortunately, however, the panel majority has rejected this prudent and reasonable course, compelling me to write separately in dissent.

34

I.

I begin with a discussion of the Geneva Conventions. Because the United States is a High Contracting Party to those Conventions, they are among "the supreme Law of the Land," pursuant to the Supremacy Clause of our Constitution. *See* U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land . . . ."). As the Supreme Court has recognized, the Geneva Conventions are an integral "part of the law of war." *See Hamdan v. Rumsfeld*, 548 U.S. 557, 628 (2006).

A.

In this appeal, we are chiefly concerned with the Third Geneva Convention, which addresses the treatment of POWs. *See* Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135. Under its Article 2, the Third Convention applies "to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties," as well as "to all cases of partial or total occupation of the territory of a High Contracting Party."

In an Article 2 international armed conflict, persons who have fallen into the power of the enemy qualify as POWs under Article 4 if they are within one of six categories. For example, the first category of POWs encompasses "[m]embers of the armed forces of a Party to the conflict, as well as members of militias or volunteer corps forming part of such armed forces." *See* Third Geneva Convention art. 4(A)(1). The second category — enumerated in Article 4(A)(2) — includes the following:

35

Members of other militias and members of other volunteer corps, including those of organized resistance movements, belonging to a Party to the conflict and operating in or outside their own territory, even if this territory is occupied, provided that such militias or volunteer corps, including such organized resistance movements, fulfil the following conditions:

> (a)     that of being commanded by a person responsible for his subordinates;
>
> (b)     that of having a fixed distinctive sign recognizable at a distance;
>
> (c)     that of carrying arms openly;
>
> (d)     that of conducting their operations in accordance with the laws and customs of war.

The third category of POWs is defined in Article 4(A)(3) as "[m]embers of regular armed forces who profess allegiance to a government or an authority not recognized by the Detaining Power." None of the other three categories is relevant here.

Pursuant to Article 5 of the Third Convention, POW status endures "from the time [the persons] fall into the power of the enemy . . . until their final release and repatriation." Article 5 also provides:

> Should any doubt arise as to whether persons having committed a belligerent act and having fallen into the hands of the enemy belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

*See* Third Geneva Convention art. 5. A significant protection conferred on POWs is immunity from criminal prosecution in the civilian and military courts for acts that do not violate the law of war. *See, e.g.*, *id.* arts. 85, 87, 99.

36

When there is an "armed conflict not of an international character," Article 3 of the Third Convention affords some protections, but only to those "[p]ersons taking no active part in the hostilities," or the wounded or sick. Accordingly, in an Article 3 non-international armed conflict, POW status is not available.

B.

With regard to the Third Convention's execution, Article 128 requires the High Contracting Parties to communicate to one another "the laws and regulations which they may adopt to ensure the application [of the Convention]." In the United States, the relevant requirements of the Third Convention have been incorporated into an Executive Branch regulation adopted by the U.S. Army, as well as the Navy, the Air Force, and the Marine Corps. That multi-service regulation is Army Regulation 190-8. Additionally, the Army relies on Army Field Manual 27-10, aptly entitled *The Law of Land Warfare*.

As explained in its "Purpose" section, Army Regulation 190-8 "implements international law, both customary and codified, relating to," among others, enemy prisoners of war and other detainees. *See* Army Reg. 190-8 at § 1-1(a) to (b). Moreover, Regulation 190-8 explicitly identifies the Third Convention as one of the "principal treaties relevant to this regulation." *Id.* § 1-1(b)(3).

Army Regulation 190-8 does not specify who determines whether a conflict is an international armed conflict under Article 2 of the Third Convention or a non-international armed conflict under the Convention's Article 3. In its "General protection policy" section, however, Regulation 190-8 provides that "[a]ll persons taken into custody by U.S. forces will be provided with the protections of the [Third Convention]

37

until some other legal status is determined by competent authority." *See* Army Reg. 190-8 at § 1-5(a)(2).

Elsewhere, in its "Tribunals" section, Army Regulation 190-8 recognizes that a person not undoubtedly excluded from POW status under Article 4 of the Third Convention is entitled to be treated as a POW pending a determination of his status by "a competent tribunal" under the Convention's Article 5. That is, Regulation 190-8 specifies:

> In accordance with Article 5 . . . , if any doubt arises as to whether a person, having committed a belligerent act and been taken into custody by the US Armed Forces, belongs to any of the categories enumerated in Article 4 . . . , such persons shall enjoy the protection of the [Third] Convention until such time as their status has been determined by a competent tribunal.

*See* Army Reg. 190-8 at § 1-6(a). Furthermore, Regulation 190-8 applies the Article 5 competent tribunal requirement to certain persons simply claiming POW status:

> A competent tribunal shall determine the status of any person not appearing to be entitled to prisoner of war status who has committed a belligerent act or has engaged in hostile activities in aid of enemy armed forces, and who asserts that he or she is entitled to treatment as a prisoner of war, or concerning whom any doubt of a like nature exists.

*Id.* § 1-6(b).

The "Tribunals" section of Army Regulation 190-8 spells out in detail the composition of an Article 5 competent tribunal. It provides that the tribunal be comprised of three commissioned officers, at least one of whom must be of a field grade (a Major, Lieutenant Colonel, or Colonel), and that the senior ranking officer will serve as President of the tribunal. *See* Army Reg. 190-8 at § 1-6(c). Regulation 190-8 also requires another non-voting officer — preferably an officer in the Judge Advocate

38

General Corps — to serve as recorder during the tribunal proceedings. *Id.* The Regulation specifies that the "convening authority shall be a commander exercising general courts-martial convening authority." *Id.* § 1-6(d). It also covers numerous procedural matters, such as the burden of proof (preponderance of the evidence) and the process of determination (closed session by a majority of the voting members of the tribunal). *Id.* § 1-6(e)(9).[1]

Consistent with Army Regulation 190-8, the Army's Field Manual on *The Law of Land Warfare* provides that, "[s]hould any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4 . . . , such persons shall enjoy the protection of the [Third] Convention until such time as their status has been determined by a competent tribunal." *See* Field Manual 27-10 at 30 (citing Third Geneva Convention art. 5). The Field Manual interprets Article 4 to apply "to any person not appearing to be entitled to prisoner-of-war status who has committed a belligerent act or has engaged in hostile

---

[1] Among other procedural matters addressed in Army Regulation 190-8 are the following: listing the order in which the members of the tribunal and the recorder are sworn; requiring that a written record be made of the proceedings; mandating that the proceedings be open, save for deliberation, voting, or other matters that could compromise security; advising the captive person of his rights at the outset of the proceedings; providing the captive person with access to all open sessions of the proceedings and, if needed, an interpreter; allowing the captive person to call and question reasonably available witnesses, or to submit written statements to be considered as evidence; affording the captive person the right to testify or otherwise address the tribunal; protecting the captive person from being compelled to testify; requiring a written report of the tribunal decision; and identifying possible determinations, including that the captive person is a POW or an innocent civilian. *See* Reg. 190-8 at § 1-6(e)(1)-(8), (10).

activities in aid of the armed forces and who asserts that he is entitled to treatment as a prisoner of war or concerning whom any other doubt of a like nature exists." *Id.* The Manual describes a "competent tribunal" as "a board of not less than three officers acting according to such procedure as may be prescribed for tribunals of this nature." *Id.*

## II.

With that background and legal framework in mind, I turn to a more comprehensive account of the tortuous proceedings leading to today's faulty decision of the panel majority.

### A.

Hamidullin, a Russian national fighting on behalf of the Taliban and its affiliate the Haqqani Network, was the lone enemy survivor of an attack against U.S. and Afghan forces at Camp Leyza in eastern Afghanistan in November 2009. After the U.S. Army captured Hamidullin, he was indicted in the Eastern District of Virginia on criminal charges arising from the attack. Significantly, nothing in the record explains how or why Hamidullin was transferred from military to civilian custody, or how he ended up in Virginia.

The initial indictment against Hamidullin was returned by the grand jury in Richmond in October 2014 and twice superseded, most recently in April 2015 by the operative indictment in Hamidullin's trial (the "Indictment"). The Indictment charged fifteen offenses, all under Title 18 of the United States Code: conspiracy to provide material support to terrorists (§ 2339A); providing material support to terrorists

40

(§ 2339A); conspiracy to destroy an aircraft of the armed forces of the United States (§ 32); attempting to destroy an aircraft of the armed forces of the United States (§ 32); conspiracy to kill an officer or employee of the United States or a person assisting such officer or employee (§ 1117); two counts of attempting to kill an officer or employee of the United States or a person assisting such officer or employee (§ 1114); conspiracy to murder a national of the United States (§ 2332(b)); two counts of attempting to murder a national of the United States (§ 2332(b)); two counts of engaging in physical violence with intent to cause serious bodily injury to a national of the United States (§ 2332(c)); conspiracy to use a weapon of mass destruction (§ 2332a); possession of a firearm in connection with a crime of violence (§ 924(c)); and conspiracy to possess a firearm in connection with a crime of violence (§ 924(o)). Several of the charges included allegations under 18 U.S.C. § 2 of aiding and abetting.

Hamidullin promptly moved in the district court for dismissal of the Indictment, invoking Rule 12(b)(1) of the Federal Rules of Criminal Procedure. Hamidullin sought dismissal of the criminal charges on multiple grounds, including that, pursuant to the Third Geneva Convention, he is a POW who did not violate the law of war and thus cannot be prosecuted in a civilian or military court. Hamidullin has decried his prosecution for being "premised on the radical conceit that in Afghanistan, only one side of an ongoing war is authorized to shoot." *See* Opening Br. of Appellant 14. He has proffered that he should instead "be detained as an enemy combatant for the duration of hostilities in Afghanistan." *Id.* at 13.

41

B.

As previously explained, the Third Geneva Convention issues relevant to Hamidullin's POW claim are whether the war in Afghanistan against the Taliban was an international armed conflict within the meaning of the Third Convention's Article 2 at the time of Hamidullin's capture in late 2009, and whether Hamidullin falls within one of the six categories of POWs articulated in the Convention's Article 4. Those disputed issues were presented by the parties to the district court for initial consideration, rather than first being determined by the Executive Branch.

1.

In June 2015, the district court conducted a hearing on Hamidullin's motion to dismiss and heard evidence from the parties' expert witnesses on the Third Convention issues, generating hundreds of pages of transcribed testimony and a multitude of exhibits. The witnesses explained in some detail the background of the Taliban and the Haqqani Network with which the Taliban was affiliated. The witnesses also explained the status of the government of Afghanistan from the September 11, 2001 terrorist attacks on the United States until Hamidullin's capture in 2009. That is, in the view of the United States and most other countries, the Taliban constituted the de facto government of Afghanistan until it was ousted from power in late 2001. Only three countries (Pakistan, the United Arab Emirates, and Saudi Arabia) had ever given diplomatic recognition to the Taliban as Afghanistan's de jure government, and each withdrew its recognition shortly after the 2001 terrorist attacks. The Taliban was replaced by the de jure government of Hamid Karzai, which began as an interim government in late 2001 and then was elected

42

in 2004. Over the years, the Karzai government has been accorded diplomatic recognition by the United States and many other countries. The United States and allies have continued to assist Afghan forces in fighting the Taliban.

The evidence admitted at the hearing and addressed by expert witnesses included the 2002 Presidential Statement — a statement that followed the Taliban's ouster from power in Afghanistan, came during the Karzai government's interim rule, and preceded Hamidullin's capture by more than seven years. By that statement, the President declared "that the provisions of [the Third] Geneva [Convention] will apply to our present conflict with the Taliban." *See* 2002 Presidential Statement at 1. In other words, the President determined that, at least as of early 2002, the war against the Taliban constituted an Article 2 international armed conflict. The 2002 Presidential Statement advised, however, that Taliban detainees are categorically excluded from POW status under Article 4. *See id.* at 2 ("I determine that the Taliban detainees are unlawful combatants and, therefore, do not qualify as prisoners of war under Article 4 of [the Third] Geneva [Convention].").

During the hearing, the expert witnesses also addressed various materials invoked by the parties in support of their respective positions. The Government submitted, for example, a 2007 report of the International Committee of the Red Cross (the "ICRC") deeming the ongoing hostilities in Afghanistan to be an Article 3 non-international armed conflict — "albeit with an international component in the form of a foreign military presence on one of the sides" — "because it is being waged with the consent and support of the respective domestic authorities and does not involve two opposed States." *See*

43

Int'l Comm. of the Red Cross, *International Humanitarian Law and the Challenges of Contemporary Armed Conflicts*, 89 Int'l Rev. of the Red Cross, 719, 725 (2007).

In support of the argument that the war against the Taliban remains an Article 2 international armed conflict because it began as one, Hamidullin presented, inter alia, a 1995 submission made by the U.S. Government itself in a war crimes prosecution in the United Nations International Criminal Tribunal for the former Yugoslavia. There, the Government asserted that "it is artificial and improper to attempt to divide [a conflict] into isolated segments, either geographically or chronologically, in an attempt to exclude the application of [the Third Convention]." *See* Submission of the Government of the United States of America Concerning Certain Arguments Made by Counsel for the Accused at 28, *The Prosecutor of the Tribunal v. Dusko Tadic*, No. IT-94-1 (ICTY July 17, 1995).

The expert witnesses at the district court's June 2015 hearing disagreed on the applicability of the Third Convention to Hamidullin and other Taliban and Haqqani fighters. One of the Government's witnesses testified that — although the United States had initially characterized the war against the Taliban as an international armed conflict under the Convention's Article 2 — the war became an Article 3 non-international armed conflict after the Karzai government was elected in 2004. That witness acknowledged that the 2002 Presidential Statement deeming the war to be an Article 2 international

armed conflict had "never been officially changed." *See* J.A. 368.[2] The witness also recognized that there was precedent, arising from the *Tadic* war crimes prosecution in the mid-1990s, for the proposition that the United States should continue to treat the war as an international armed conflict because of its initial characterization. *Id.* at 376. In addition, the witness observed that the United States' longstanding "practice has been to follow the rules for an international armed conflict without making a legal determination as to whether they apply," based on "a hope for reciprocity if our personnel fall into enemy hands." *Id.* at 326. Nevertheless, the witness insisted that there "was a sea change in how some of these things were looked at" following the September 11, 2001 terrorist attacks. *Id.* at 376. Consistent with the 2007 ICRC report, the witness concluded that the war against the Taliban had become an Article 3 non-international armed conflict and thus that the Convention's Article 4 protections for POWs were not available in 2009 to forces of the Taliban and the Haqqani Network.

The same witness further opined that, even assuming the war against the Taliban qualified as an international armed conflict in 2009, no Taliban and Haqqani fighters can satisfy Article 4 criteria for POWs. The witness premised that conclusion on an independent analysis, without relying on the 2002 Presidential Statement's Article 4 determination. Importantly, the witness acknowledged that the 2002 Presidential Statement's Article 4 determination was "flawed" and "politically based rather than

---

[2] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

based on law," in that it did not take all of the Article 4 factors into account. *See* J.A. 400-01 (confirming his view that "President Bush erred in accepting the advice of individuals who lacked military experience and . . . possessed skepticism, if not [disdain,] for the law of war, over [the advice] of individuals with military combat and substantial law of war expertise and experience" (internal quotation marks omitted)).

By contrast, Hamidullin's expert witness testified that — because the war against the Taliban began as an Article 2 international armed conflict — it remained so through 2009 and beyond. That witness also rejected the notion that the war may be characterized as an Article 3 non-international armed conflict, relying on news reports that the United States had attacked Taliban targets outside Afghanistan (in Pakistan), and that Pakistan and Iran have supplied the Taliban with troops, weapons, and other materials. *See* J.A. 440 (acknowledging that "[s]ome of this may be classified" and thus verifiable only by government officials and others with appropriate security clearances). As for the Article 4 issue, the witness maintained that Taliban and Haqqani fighters are eligible for POW status under Article 4(A)(1) and (A)(3), as members of the armed forces of a government-in-exile.

## 2.

In July 2015, following the evidentiary hearing, the district court denied the motion to dismiss the Indictment, ruling, inter alia, that Hamidullin is not a POW. In so doing, the court explained that the complexity of its analysis was compounded by a dearth of judicial authority applying the law of war to the conflict in Afghanistan. As the court observed, "[w]hile the legal landscape is filled with respectable military and

46

scholarly treatises, along with a host of public policy position papers, few courts have had occasion to venture into this terrain." *See Hamidullin*, 114 F. Supp. 3d at 367-68. The court characterized the central issue with respect to Hamidullin's POW claim as "whether the Taliban [and its Haqqani allies] are lawful combatants entitled to prisoner of war treatment under the [Third] Geneva Convention, or a band of insurgent outlaws to be dealt with as criminals." *Id.* at 387. To answer that inquiry, the court related that it was not necessary to "determine whether the conflict in Afghanistan is international in nature as contemplated by Article 2." *Id.* Indeed, the court observed not only that the parties' expert witnesses disagreed on the Article 2 issue, but that the issue "may elude a definitive answer." *Id.* To "surmount[] this hurdle," the court simply assumed that the war against the Taliban was an Article 2 international armed conflict at the time of Hamidullin's capture and proceeded to its own Article 4 analysis. *Id.*

Pursuant to its Article 4 analysis, the district court concluded that Hamidullin is not eligible for POW status. *See Hamidullin*, 114 F. Supp. 3d at 387-88 (summarily ruling that Taliban and Haqqani fighters do not satisfy Article 4(A)(1) and (A)(3), and further ruling, with explanation, that such fighters also fail Article 4(A)(2)). In rendering its analysis, the court did not invoke or evidently accord any deference to the 2002 Presidential Statement's Article 4 determination. Furthermore, the court did not acknowledge either the Third Convention's requirement for Article 5 proceedings before a "competent tribunal," or Army Regulation 190-8's directive that Article 5 proceedings in the United States are to be conducted by a tribunal of three commissioned military officers. In the circumstances, the court also did not address whether or how a U.S. court

47

could be a "competent tribunal" authorized to conduct Article 5 proceedings and decide a POW claim.[3]

## C.

By their opening appellate briefs, the parties disputed the correctness of the district court's POW determination — but they did not question the court's authority to decide Hamidullin's POW status in the first instance.

Notably, the Government argued that the 2002 Presidential Statement's categorical exclusion of Taliban fighters from POW status under Article 4 "is entitled to a degree of deference as a reasonable interpretation and application of the [Third Geneva Convention] to the Taliban by the Commander in Chief." *See* Opening Br. of Appellee 34. The Government specified, however, that it did "not argue that the President's determination is dispositive of [Hamidullin's POW claim]." *Id.* As the Government explained, that is why it "submitted its evidence to the district court for determination and to this Court for appellate review." *Id.* Concurrently, the Government urged us to reach the Article 2 issue and resolve it based on authorities invoked in the district court, including the ICRC and its 2007 report. *Id.* at 28 (contending that, "[a]t the time of

---

[3] Other aspects of the district court's Article 4 analysis also bear mentioning. The court treated Hamidullin's POW claim as an affirmative defense that Hamidullin bore the burden of proving. Rather than considering the characteristics of Hamidullin individually, the court focused on Taliban and Haqqani fighters generally. In any event, the court had before it only the sparse facts alleged in the Complaint and the "little [that] was said [during the evidentiary hearing] about [Hamidullin] as an individual military actor." *See Hamidullin, 114 F. Supp. at 386.* When additional relevant evidence was adduced at trial, the court did not revisit Hamidullin's POW claim, including the issue of whether Hamidullin qualifies as a POW under Article 4(A)(2).

Hamidullin's attack, there was no international conflict between the United States and Afghanistan"). The Government did not then assert that the Article 2 issue had already been decided by the Executive Branch.

During the initial oral argument in this appeal, in December 2016, we questioned the parties about the district court's authority to decide Hamidullin's POW status in the first instance. Soon thereafter, we received from the Government what it purported was a definitive Executive Branch statement on the nature of the war against the Taliban: a December 2016 report signed by President Barack Obama and entitled *Report on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations* (the "2016 Presidential Report"). The 2016 Presidential Report indicated that the war in Afghanistan against the Taliban was an Article 3 non-international armed conflict as of late 2016, without explaining when the war transformed from an Article 2 international armed conflict or specifying the status of the war at the time of Hamidullin's capture in late 2009. For example, the Report stated that "the United States is currently engaged in hostilities against only non-State actors," i.e., non-international armed conflicts. *See* 2016 Report at 19. That statement did not concern the nature of the war against the Taliban in late 2009, the time relevant to Hamidullin's POW claim. Elsewhere, the Report referred to non-international armed conflicts "such as the hostilities authorized by the 2001 [Authorization for Use of Military Force (the 'AUMF')]." *Id.* at 32. As the Supreme Court explained in *Hamdan v. Rumsfeld*, the AUMF authorized both the war against al Qaeda (a non-international armed conflict) and the war against the Taliban (at least initially an international armed

49

conflict). *See* 548 U.S. 557, 568 (2006). Thus, the 2016 Presidential Report's reference to non-international armed conflicts authorized by the AUMF did not specify the nature of the war against the Taliban in late 2009.

Additionally, the 2016 Presidential Report advised that "the United States often applies policies that are more restrictive than what would be required as a matter of law," leaving open the possibility that Hamidullin could be accorded POW status even if the Executive considers the war against the Taliban to be a non-international armed conflict. *See* 2016 Report at 19. Nonetheless, when it submitted the Report to this Court, the Government asserted that the Report "reflects the United States' view that the conflict in Afghanistan is a non-international armed conflict," and "[t]hat conclusion alone" renders POW status unavailable to Hamidullin. *See* Letter under Fed. R. App. P. 28(j) at 1, *United States v. Hamidullin*, No. 15-4788 (4th Cir. Dec. 14, 2016), ECF No. 42. The Government also repeated arguments aimed at convincing us to affirm the district court's determination that Hamidullin does not qualify as a POW under Article 4.

In response, Hamidullin confirmed his view that the characterization of a war as an Article 2 international armed conflict or an Article 3 non-international armed conflict "is for the Court, not the Executive." *See* Response to Letter under Fed. R. App. P. 28(j) at 1, *United States v. Hamidullin*, No. 15-4788 (4th Cir. Dec. 15, 2016), ECF No. 43. For that proposition, Hamidullin relied on the Supreme Court's decision in *Hamdan*, 548 U.S. at 629-31 (rejecting the 2002 Presidential Statement's conclusion that the war against al Qaeda was neither an Article 2 international armed conflict nor an Article 3 non-international armed conflict). Hamidullin's response also invoked *Hamdi v. Rumsfeld*,

50

542 U.S. 507, 550 (2004) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment), to contest the President's ability to categorically exclude detainees from POW protections under Article 4, as the 2002 Presidential Statement had endeavored to do.

Several months later, in June 2017, we directed the parties to file supplemental briefs addressing the issue of the district court's "jurisdiction to decide, in the first instance, whether Hamidullin qualifies as a prisoner of war under the Third Geneva Convention." *See* Order at 1, *United States v. Hamidullin*, No. 15-4788 (4th Cir. June 23, 2017), ECF No. 48. In so doing, we advised that "[t]he briefs should discuss the effect of Army Regulation 190-8 on the court's jurisdiction." *Id.* The parties simultaneously filed supplemental opening and response briefs.

Strikingly, the Government's supplemental briefs contended that the Third Convention determinations relevant to Hamidullin's POW claim "are properly made by the Commander-in-Chief or other higher authorities in the Executive Branch" — not a military tribunal or, by implication, a federal court. *See* Suppl. Br. of Appellee 7; *see also id.* at 8 (reiterating that "overarching questions, such as the appropriate classification of the conflict, . . . properly belong to higher authorities within the Executive Branch"). In addition to asserting that the Third Convention issues were for the Executive to decide, the Government declared that the Executive had in fact made the relevant determinations herein, i.e., that the war against the Taliban was an Article 3 non-international armed conflict by late 2009 (apparently based on the 2016 Presidential Report), and that, in any

51

event, Taliban fighters are categorically excluded from POW status under Article 4 (based on the 2002 Presidential Statement).

Of course, the Government had previously treated the district court as the appropriate first adjudicator of the Third Convention issues and had conceded that the 2002 Presidential Statement was not dispositive of Hamidullin's POW claim. Without acknowledging or explaining its significant change of position, the Government now insisted that "Hamidullin's legal status has been determined by a 'competent authority' within the meaning of [Army Regulation 190-8] because the President — the highest 'competent authority' on the subject — conclusively determined in 2002 that Taliban detainees such as Hamidullin do not qualify for POW status." *See* Suppl. Br. of Appellee 2. From there, the Government defended the district court's disposition of Hamidullin's POW claim as consistent with Regulation 190-8 and the Executive's pronouncements because there is no doubt that Hamidullin is ineligible to be deemed a POW. The Government also cautioned us, in emphatic terms, that

> [t]he Executive's determinations regarding the character of the conflict, the status of the Taliban, and the proper application of the [Third Convention] and [Regulation] 190-8 are entitled to great deference by this Court. These determinations constitute a classic exercise of the President's war powers and his authority over foreign affairs that also implicates his exclusive authority to determine whether a foreign government merits recognition.

*Id.* at 13.

In his supplemental briefs, Hamidullin for the first time argued that Army Regulation 190-8 requires that a military tribunal determine his POW status, and that such a determination is a prerequisite to his criminal prosecution. According to

52

Hamidullin, "[b]ecause the Executive Branch failed to follow its own regulation and the [Third Convention] in this case, [he] retains status as a prisoner of war and is immune from ordinary criminal liability," thereby necessitating that we "vacate his convictions and remand with the direction that he be transferred to the custody of the U.S. military and afforded treatment in accordance with Army Regulation 190-8." *See* Suppl. Br. of Appellant 14-15. Hamidullin stood by his position that the war against the Taliban remains an Article 2 international armed conflict, but contended that the status of the war is irrelevant, in that "[n]othing in [Regulation 190-8's] language limits [its] application based on the type of conflict in which a person is seized." *See* Suppl. Response Br. of Appellant 2 (invoking the provision of Regulation 190-8 at § 1-5(a)(2) that "*[a]ll* persons taken into custody by U.S. forces will be provided with the protections of the [Third Convention] until some other legal status is determined by competent authority" (emphasis added)). Hamidullin also asserted "that a detainee's seizure by U.S. forces in armed conflict coupled with an assertion of prisoner of war status is equivalent to 'doubt' which requires the detainee to be treated as a POW until a competent tribunal, as defined by [Regulation 190-8], decides otherwise." *Id.* at 3 (citing Army Reg. 190-8 at § 1-6(b)). Moreover, Hamidullin criticized the Government for relying on the 2002 Presidential Statement and ignoring "the near-universal conclusion, since [the Statement] was issued, that the President's [Article 4] determination violated the [Third Convention] and [Regulation] 190-8." *Id.* at 4.

Following our announcement that the second oral argument in this matter would be held in December 2017, the Government opted to file an additional supplemental

brief. No longer arguing that the relevant Third Convention issues were conclusively determined by the 2016 Presidential Report and the 2002 Presidential Statement, the Government seemed to revert to its original position that it was up to the courts to decide whether the war against the Taliban was an Article 2 international armed conflict in late 2009 and whether Hamidullin is eligible for POW status under Article 4. The Government merely included the 2016 Presidential Report in a string of authorities cited for the purpose of convincing us to find that the war had become an Article 3 non-international armed conflict prior to Hamidullin's capture. Meanwhile, the Government did not explicitly reference the 2002 Presidential Statement at all. Rather, the Government mentioned only that the Executive Branch "has specifically determined that members of the Taliban are not entitled to POW protections," and did so only in the course of urging us to affirm the POW determination made by the district court. *See* Second Suppl. Br. of Appellee 14 ("To be sure, the judicial branch must render its own decision on the availability of immunity to criminal charges here. But a joint judgment of the political branches in this arena is entitled to the utmost deference from this Court.").

At the second oral argument, however, the Government revived its theory that the Executive Branch has already answered the Article 2 and Article 4 questions. Rather than crediting the 2016 Presidential Report with deciding the Article 2 issue, the Government asserted it is implicit in the manner the United States has carried out the war against the Taliban since 2001 that the Executive Branch changed the status of the war from an Article 2 international armed conflict to an Article 3 non-international armed conflict by 2009. With respect to the Article 4 issue, the Government reiterated its

54

reliance on the 2002 Presidential Statement.  For his part, Hamidullin stood firm that the Article 2 question is for the courts, but that Army Regulation 190-8 in any event guarantees a military tribunal's assessment of his POW status under Article 4.

D.

That brings us to today, when my friends of the panel majority have taken it upon themselves — under the guise of treaty interpretation — to resolve the conflicting evidence and authorities to make their original determination that the war against the Taliban was no longer an Article 2 international armed conflict by 2009.  Additionally, the majority rejects Hamidullin's argument that, regardless of the status of the war, Regulation 190-8 entitles him to have his Article 4 eligibility for POW status determined by a military tribunal.  According to the majority, its decision safeguards the courts' jurisdiction to interpret treaties and adjudicate crimes, and also respects the 2002 Presidential Statement.  As explained below, however, the majority actually usurps the authority of the Executive Branch and fails to grapple with significant questions surrounding the enforceability of the 2002 Presidential Statement's categorical Article 4 ruling.  I therefore must dissent from the majority's decision.

III.

As I see it, the Third Geneva Convention questions underlying Hamidullin's POW claim are initially for the Executive Branch, not the Judiciary.  Crucially, we are asked here not to simply interpret the Third Convention — as the Judiciary is entirely capable and qualified to do — but to determine whether the Convention applies to particular

55

hostilities and a particular detainee. In the circumstances, I believe we must refer the Third Convention questions to the Executive for first consideration and then review its answers as appropriate. Indeed, the Government itself espoused in its original supplemental brief that it is the Executive's role to determine "the character of the conflict, the status of the Taliban, and the proper application of the [Third Convention] and [Army Regulation] 190-8," as those "determinations constitute a classic exercise of the President's war powers and his authority over foreign affairs that also implicates his exclusive authority to determine whether a foreign government merits recognition." *See* Suppl. Br. of Appellee 13 (relying on *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2086 (2015), for the proposition that "[r]ecognition is a topic on which the Nation must speak with one voice," and "[t]hat voice must be the President's" (alteration and internal quotation marks omitted)); *see also, e.g.*, *Chi. & S. Air Lines, Inc. v. Waterman S. S. Corp.*, 333 U.S. 103, 109 (1948) (generally recognizing that the President "possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs").

## A.

That we should not deem ourselves to be the primary arbiters of the Third Convention questions is demonstrated by the Supreme Court's decision in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006).[4] The *Hamdan* matter involved a Yemeni national and

---

[4] Notably, Hamidullin invoked the *Hamdan* decision as support for his contention that the Article 2 question is for the Judiciary, not the Executive Branch. Upon examination, however, *Hamdan* engenders the opposite conclusion.

alleged member of al Qaeda who was captured in Afghanistan, turned over to the U.S. military, and imprisoned in Guantanamo Bay, Cuba. The question was whether Hamdan could be tried on a criminal conspiracy charge by a U.S. military commission. Of particular relevance here, the *Hamdan* Court concluded "that the military commission convened to try Hamdan lacks power to proceed because its structure and procedures violate . . . the Geneva Conventions." *See* 548 U.S. at 567.

As part of its analysis, the *Hamdan* Court recognized that there was a distinction between the war against the Taliban — which was accepted at that time as an Article 2 international armed conflict based on the 2002 Presidential Statement — and the war against al Qaeda. *See* 548 U.S. at 628-29 & n.60. The 2002 Presidential Statement declared that the separate war against al Qaeda was neither an Article 2 international armed conflict nor an Article 3 non-international conflict, potentially rendering Hamdan ineligible for any Third Convention protections at all. *Id.* at 628-30.

Significantly, the Third Convention issue presented in *Hamdan* — whether Hamdan could be tried by military commission because the war against al Qaeda was neither an Article 2 international armed conflict nor an Article 3 non-international armed conflict — was first decided by the Executive Branch and then presented to the courts for review. And, in assessing that issue, the Supreme Court expressly refrained from examining the characteristics of the war against al Qaeda and declaring it to be either an international or non-international armed conflict. *See Hamdan*, 548 U.S. at 629. Rather, the Court cautiously confined itself to a straightforward interpretation of the Third Convention sufficient to dispose of Hamdan's appeal. That is, the Court determined,

premised on the Third Convention's language, that any conflict that does not constitute an Article 2 international conflict must be an Article 3 non-international conflict. *Id.* at 629-31. From there, the Court ruled that Hamdan was entitled at a minimum to the protections of Article 3, and that the military commission convened to try him contravened Article 3's requirements. *Id.* at 631-32 ("Article 3, then, is applicable here and . . . requires that Hamdan be tried by a 'regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.").[5]

As the panel majority would now have it, this Court — like the Supreme Court in *Hamdan* — is a simple treaty interpreter. Unlike the *Hamdan* Court, however, we are not reviewing an Executive Branch determination, and we cannot restrict ourselves to a clear-cut interpretation of the Third Convention. Instead, we are asked to determine in the first instance whether particular hostilities (the war against the Taliban, as of late 2009) constituted an Article 2 international armed conflict, and whether a particular detainee (Hamidullin) is eligible for Article 4 POW status. Despite those material distinctions and in contravention of *Hamdan*'s cautious approach, the panel majority takes up the Third Convention questions.

---

[5] The *Hamdan* Court also acknowledged Hamdan's argument that he was entitled to be treated as a POW under Article 5 of the Third Convention and Army Regulation 190-8 "until his status is determined by a 'competent tribunal.'" *See* 548 U.S. at 629 n.61. Because the Court concluded "that Hamdan may not, in any event, be tried by the military commission the President has convened," the Court reserved "the question whether his potential status as a prisoner of war independently renders illegal his trial by military commission." *Id.*

58

B.

The unsuitability of leaving the Third Convention questions to the courts is also illustrated by the panel majority's decision, wherein the majority determines that when Hamidullin was captured by the U.S. Army in late 2009, "the conflict in Afghanistan was not an international armed conflict." *See ante* at 12. The Article 2 determination is premised on factual findings rendered by the majority, including that "[t]he conflict in Afghanistan began in 2001 as . . . a conflict between the United States and its coalition partners on one side, and the Taliban-controlled Afghan government on the other," and that since "the Taliban lost control of the government and was replaced by a government led by Hamid Karzai," there merely has been a conflict in Afghanistan "against unlawful Taliban insurgents." *Id.* at 12-13.

"It is axiomatic, however, as our Judge Hall eloquently explained, that appellate courts do not make factual findings." *See Robinson v. Wix Filtration Corp.*, 599 F.3d 403, 419 (4th Cir. 2010) (King, J., dissenting) (citing *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 575-76 (4th Cir. 1995) ("It is a basic tenet of our legal system that, although appellate courts often review facts found by a judge or jury . . . , they do not make such findings in the first instance.")). Furthermore, the panel majority's factual findings are on shaky evidentiary ground. The record contains only the evidence — much of it disputed — that the parties chose to present. And even that evidence casts doubt on the majority's findings.

For example, in opining that the war against the Taliban cannot be characterized as an Article 3 non-international armed conflict, Hamidullin's expert witness pointed to

news reports that the war has not been confined to Afghanistan (the United States having attacked Taliban targets in Pakistan), and that the Taliban has been supported by other countries (Pakistan and Iran having supplied troops, weapons, and other materials). *See* J.A. 440. The witness explained that the reported information was probably classified but could be verified by government officials with appropriate security clearances. *Id.* Yet the panel majority does not acknowledge or confront Hamidullin's evidence in finding that the war has been waged only in Afghanistan and solely against the Taliban. Nor does the majority express any concern over the record's lack of classified, but potentially pertinent, evidence.

Further undermining the panel majority's decision is its reliance on debatable, non-binding authorities and so-called "[c]ommon sense." *See ante* at 15 (simplifying the issue to the supposedly commonsensical proposition that "[i]f the conflict in Afghanistan was originally an international armed conflict occurring between two 'High Contracting Parties' — the United States and the Afghan government — the conflict cannot remain international when the conflict between the recognized Afghan government and the United States has ceased"). The majority wholly ignores the compelling contrary authorities that led the district court to conclude, quite understandably, that the Article 2 question may be unanswerable — at least on the limited materials submitted in these court proceedings.

Worse still, the panel majority allows for just two possibilities in its Article 2 analysis: first, that the war against the Taliban was an Article 2 international armed conflict in late 2009, leaving Hamidullin eligible to be adjudged a POW; or second, that

60

the war was instead an Article 3 non-international armed conflict at the relevant time, excluding Hamidullin from POW status. An important third possibility would be available to the Executive Branch: that, notwithstanding the proper characterization of the war, Hamidullin may be treated as a POW. The 2016 Presidential Report reserved the right to exceed the requirements of the Third Convention, and the Government's expert witness recognized that the United States has long accorded POW status to detainees lacking legal entitlement in the hope of securing reciprocal treatment of U.S. forces. But, in the majority's conception of the courts as treaty interpreters, the Judiciary is without the authority to make such a discretionary judgment.

## C.

Other problems surface in the panel majority's decision where it rejects Hamidullin's argument that, regardless of the status of the war against the Taliban, Army Regulation 190-8 entitles him to have his Article 4 eligibility for POW status determined by a military tribunal. According to Hamidullin, all detainees who claim to be POWs must be accorded military tribunals for determination of their status. To be clear, I am not saying that argument is meritorious. I do not reach the issue, which I believe should be referred to the Executive Branch as part of its initial consideration of the Third Convention questions. What I am saying is that the majority's reasons for rejecting Hamidullin's argument are untenable.

## 1.

First, the panel majority reasons that accepting Hamidullin's argument would strip the federal courts of the jurisdiction to interpret treaties and adjudicate crimes. In other

words, the majority concludes that the courts possess the authority to decide in the first instance whether a detainee qualifies as a POW pursuant to Article 4 of the Third Convention — i.e., a federal court can be the "competent tribunal" required by the Convention's Article 5. I disagree. In the United States, Article 5 proceedings are to be conducted before a U.S. military tribunal. *See* Army Reg. 190-8 at § 1-6. Arguably, the President also may decide detainees' POW status under Article 4. But the Article 4 question is not one that can be answered initially by the courts.

a.

As previously explained, the Third Convention leaves it to the High Contracting Parties to adopt laws and regulations to ensure the Convention's application. *See* Third Geneva Convention art. 128. Thus, an Article 5 "competent tribunal is established by domestic law," and "[r]ules clarifying the tribunal's competence, composition and procedure must be provided by the detaining State." *See* Yasmin Naqvi, *Doubtful Prisoner-of-War Status*, 84 Int'l Rev. of the Red Cross 571, 593 (2002). Relevant to persons captured by the United States, Army Regulation 190-8 specifies the composition of an Article 5 competent tribunal — a military tribunal — and delineates the procedures to be followed in Article 5 proceedings. Among the extensive requirements and procedures spelled out in Regulation 190-8 is that the tribunal be comprised of three commissioned officers, with the senior ranking officer serving as the tribunal's President and an additional non-voting officer serving as its recorder. *See* Army Reg. 190-8 at § 1-6(c).

Simply put, pursuant to Army Regulation 190-8, the United States has placed the responsibility for the Third Convention's Article 5 proceedings in the hands of military tribunals — not the federal courts. Because Regulation 190-8 has the force and effect of law, the courts are bound to respect and enforce it. *See, e.g.*, *Al Warafi v. Obama*, 716 F.3d 627, 629 (D.C. Cir. 2013) ("Army Regulation 190-8 is domestic U.S. law . . . ."). The controlling legal authorities for that proposition extend to Supreme Court decisions nearly 200 years old. *See Billings v. Truesdell*, 321 U.S. 542, 551 (1944) ("War Department Regulations have the force of law . . . ."); *Standard Oil Co. v. Johnson*, 316 U.S. 481, 484 (1942) ("[A]uthorized War Department regulations have the force of law."); *Gratiot v. United States*, 45 U.S. (4 How.) 80, 117 (1846) ("As to the army regulations, this court has too repeatedly said, that they have the force of law . . . ."); *United States v. Eliason*, 41 U.S. (16 Pet.) 291, 302 (1842) ("The secretary of war is the regular constitutional organ of the president, for the administration of the military establishment of the nation; and rules and orders publicly promulged through him must be received as the acts of the executive, and as such, be binding upon all within the sphere of his legal and constitutional authority.").

Contrary to the panel majority, Army Regulation 190-8's designation of military tribunals to conduct Article 5 proceedings does not strip the federal courts of jurisdiction to interpret treaties and adjudicate crimes. First of all, Article 4 POW determinations, as previously stated, are not matters of simple treaty interpretation within the province of the courts. Additionally, as Hamidullin has contended, Regulation 190-8's requirement that a military tribunal make Article 4 POW determinations simply serves as a legal

63

prerequisite to criminal prosecution. *See, e.g.*, 18 U.S.C. § 249(b) (requiring certification from Attorney General before hate crimes prosecution may proceed); *id.* § 5032 (similarly mandating certification for juvenile prosecution); *see also* Suppl. Br. of Appellant 12 ("Analogous circumstances exist in which the government must comply with prerequisite steps before proceeding with a criminal prosecution." (citing §§ 249(b) and 5032)).

b.

There also is no precedent for the proposition that a federal court is a proper substitute for a military tribunal when it comes to Article 5 proceedings. Indeed, we previously observed in *Hamdi v. Rumsfeld* that "it is anything but clear that the 'competent tribunal' which would determine [a person's POW] status would be an Article III court." *See* 316 F.3d 450, 469 (4th Cir. 2003) (directing dismissal of 28 U.S.C. § 2241 petition challenging lawfulness of U.S. citizen's detention as enemy combatant), *vacated on other grounds by* 542 U.S. 507 (2004). Moreover, Justice O'Connor's opinion in *Hamdi* recognized "that military regulations . . . dictat[e] that [military] tribunals be made available to determine the status of enemy detainees who assert prisoner-of-war status under the [Third] Geneva Convention." *See* 542 U.S. at 538 (plurality opinion) (citing Army Reg. 190-8 at § 1-6).

The scant authority supporting the notion that a U.S. court can be an Article 5 competent tribunal is not binding or even persuasive here. In *United States v. Noriega*, for example, a district court in Florida was confronted at sentencing with whether the captured former dictator of Panama, Manuel Noriega, was a POW. *See* 808 F. Supp. 791

(S.D. Fla. 1992). Although the court observed "that conducting foreign policy is generally the province of the Executive branch," the court did not acknowledge the U.S. military regulations assigning responsibility for Article 5 proceedings to military tribunals. *Id.* at 796. The court ultimately surmised that, because it was "properly presented with [Noriega's POW claim]," it was, "under the law, a 'competent tribunal' which can decide the issue." *Id.* The court offered no compelling legal rationale for that conclusion, however, and its ruling on Noriega's status — that he was a POW — was never reviewed by an appellate court. *See Noriega v. Pastrana*, 559 U.S. 917, 919 n.2, 921 (2010) (Thomas, J., dissenting from the denial of certiorari) (recounting that, "notwithstanding various separation-of-powers and justiciability concerns," the district court designated Noriega a POW, and the POW designation went unchallenged in later proceedings).

In rejecting Hamidullin's POW claim, the distinguished presiding district judge relied on an Eastern District of Virginia colleague's decision several years ago in *United States v. Lindh*, 212 F. Supp. 2d 541 (E.D. Va. 2002). Like the POW ruling in Noriega, the *Lindh* decision was not appealed. In *Lindh*, the Government argued that Lindh, a U.S. citizen alleged to have fought for the Taliban, was not immune from criminal prosecution because the 2002 Presidential Statement had categorically excluded Taliban fighters from POW status under Article 4 of the Third Convention. The *Lindh* court observed that the 2002 Presidential Statement's Article 4 determination was subject to judicial review, but entitled to substantial deference. *See* 212 F. Supp. 2d at 556-57 (explaining that such deference was "warranted given the President's special competency in, and constitutional

65

responsibility for, foreign affairs and the conduct of overseas military operations"). Nevertheless, the court engaged in its own assessment of Lindh's POW status and determined that he failed to prove that Taliban fighters satisfy the criteria set forth in Article 4(A)(2). *Id.* at 557-58 (concluding that, "even absent deference, the Taliban falls far short when measured against the four [Article 4(A)(2)] criteria"). Like the district court here, the *Lindh* court failed to acknowledge Article 5 and its requirement for proceedings before a "competent tribunal," or Army Regulation 190-8 and its directive that Article 5 proceedings are to be conducted by a military tribunal.

At bottom, the panel majority's view that a federal court may constitute the "competent tribunal" required by Article 5 of the Third Convention garners no support from controlling or even persuasive authority. More importantly, the majority's view defies the Convention and the United States' chosen scheme for making Article 4 POW determinations, as set forth in Army Regulation 190-8. Consequently, it is wrong for the majority to dismiss Hamidullin's quest for a military tribunal as an improper effort to strip the courts of jurisdiction.[6]

---

[6] Although the panel majority confirms the district court's authority to render its Article 4 POW determination, the majority deems it unnecessary to review the merits of that determination (because the majority alternatively finds that the war against the Taliban was not an Article 2 international armed conflict by 2009). The district court's Article 4 analysis raises various questions, however, about the propriety of the proceedings and whether they were conducted in a manner consistent with that of a U.S. military tribunal. *See supra* note 3. For example, how could it be proper for the court to place the burden on Hamidullin to prove he is a POW? Shouldn't the court have considered the characteristics of Hamidullin individually, rather than focusing on Taliban and Haqqani fighters generally? Should the court have considered the additional relevant evidence that was adduced in Hamidullin's trial? To be sure, there also is doubt about
(Continued)

2.

The panel majority next invokes the 2002 Presidential Statement as a basis for rejecting Hamidullin's argument that Regulation 190-8 entitles him to have his Article 4 eligibility for POW status determined by a military tribunal. The majority explains that a remand to a military tribunal would "necessarily involve a reconsideration of President Bush's [categorical Article 4 determination]," and that it would be improper for this Court "to provide a three-member military tribunal with the authority to displace the president's interpretation of the Convention." *See ante* at 19; *see also id.* at 28 (Wilkinson, J., concurring) ("A military regulation cannot overcome . . . the Commander-in-Chief's declaration that 'Taliban detainees are unlawful combatants and, therefore, do not qualify as prisoners of war' under the Third Geneva Convention . . . ." (quoting 2002 Presidential Statement at 2)). In so doing, the majority unquestioningly accepts the 2002 Presidential Statement as a conclusive determination of the Article 4 question.

---

the court's conclusion that Hamidullin is not within any Article 4 category. *See* Opening Br. of Appellant 23 (arguing that Hamidullin satisfies the requirements of Article 4(A)(2), as "the testimony at trial indicates that Mr. Hamidullin and his fellow soldiers were organized in a military command, wore distinctive clothing distinguishing them from the local population, openly carried arms, and did not violate the laws and customs of war"); *see also id.* at 25-26 (separately contending that, as a member of the armed forces of Afghanistan's government-in-exile, Hamidullin is a POW under Article 4(A)(3), which "was designed to cover situations which had caused numerous problems during World War II with its many governments-in-exile," including Nazi Germany's refusal to accord POW status to forces of the Free French (internal quotation marks omitted)).

67

Significantly, the panel majority does not acknowledge that the Government only belatedly invoked the 2002 Presidential Statement as dispositive of Hamidullin's Article 4 eligibility for POW status, precluding development in the district court of how much deference the Statement may be due. The majority also does not acknowledge that the Government has since taken inconsistent positions on the Statement's efficacy. Or that the Government's own expert witness condemned the Statement's Article 4 determination as "flawed" and "politically based rather than based on law." *See* J.A. 400. Or that the district court, and the *Lindh* court before it, declined to defer to the Statement in conducting their own Article 4 analyses. Or that the Statement's Article 4 determination has been questioned by the Supreme Court. *See Hamdi*, 542 U.S. at 550 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (observing that it "appears to be a violation [of Article 5 of the Third Convention]" and "at odds with [Army Regulation 190-8]" for the President himself to categorically withhold POW status from a captured person instead of convening a military tribunal to make an individual determination).

Strikingly, the panel majority also does not explain why it can conclude that the 2002 Presidential Statement's Article 2 determination (that the war against the Taliban is an international armed conflict) has been implicitly abrogated, but no one can question the continuing force of the Statement's Article 4 determination (that Taliban fighters nevertheless cannot qualify as POWs). Particularly flummoxing is my good friend's separate opinion, wherein he accuses me of stubbornly and unreasonably ignoring the "many" "clear statement[s] from the Executive Branch on whether Taliban and Haqqani

68

fighters should be accorded POW status" — including the 2002 Presidential Statement. *See ante* at 28 n.1 (Wilkinson, J., concurring) (internal quotation marks omitted). My friend emphasizes that the Statement's Article 4 determination "has never been rescinded, superseded, or modified," and he declares that "its relevance could not have been diminished in 2009" because, "by that time, the Taliban had been overthrown and the conflict had become a non-international armed conflict." *Id.* Of course, the Statement's Article 2 determination also has never been explicitly "rescinded, superseded, or modified," and it was made in 2002 *following* the Taliban's ouster from power.

In these circumstances, we are in no position to defer to the 2002 Presidential Statement's Article 4 determination. As such, the panel majority's embrace of the Statement is ill-advised and inappropriate.

D.

On a final note, I address the other supposed "clear statement[s] from the Executive Branch" identified by my good friend in his separate opinion. *See ante* at 28 n.1 (Wilkinson, J., concurring) (internal quotation marks omitted). They include the Government's initial appellate argument that the 2002 Presidential Statement's Article 4 determination is entitled to deference but not dispositive of Hamidullin's POW claim, and the Government's subsequent, inconsistent contention that the Statement conclusively renders Hamidullin ineligible for POW status. *Id.* (citing Opening Br. of Appellee 33-35; Suppl. Br. of Appellee 2). "The clearest statement imaginable," according to my friend, "is the prosecution of Hamidullin that began in 2014 and the conviction of Hamidullin defended by the government on appeal." *Id.*

69

Contrary to my friend's characterization of "clear statement[s] from the Executive Branch," the Government has acknowledged that nothing in the record explains how or why Hamidullin was transferred from military to civilian custody, or how he ended up in Virginia. Meanwhile, the Government has not sought to supplement the record or otherwise provide an explanation that can be reviewed by this Court. As a former federal prosecutor, I know that if the Government could explain some satisfactory pre-prosecution process afforded Hamidullin, it would do so. I am not willing to accept that the mere fact of Hamidullin's prosecution guarantees that the Executive Branch properly considered his POW status — especially when the Government has seesawed between insisting, on the one hand, that the POW determination is for the courts, and on the other hand, that an unassailable Executive determination has already been made (via the 2002 Presidential Statement, or maybe the 2016 Presidential Report, or perhaps implicitly some other way). The Government is not infallible, and I will not heedlessly treat it as such.

## IV.

Pursuant to the foregoing, I respectfully dissent from the panel majority's decision. Rather than affirming Hamidullin's convictions (as the majority does), or vacating those convictions (as Hamidullin wants us to do), I would remand this matter for the limited purpose of the Executive Branch's consideration and explanation of Hamidullin's POW status. In my view, unless and until the Executive resolves his POW claim, Hamidullin should be treated in accordance with the Third Geneva Convention

70

and Army Regulation 190-8. The district court should also be authorized to conduct related proceedings, including proceedings on the status of the criminal judgment against Hamidullin pending the Executive's resolution of his POW claim; proceedings to review, if appropriate, any POW determination made by the Executive; and proceedings to ascertain, in the wake of any POW determination, the extent of Hamidullin's susceptibility to criminal prosecution and the validity of the criminal judgment against him. Until such remand proceedings are completed, we should hold in abeyance the balance of this appeal, including Hamidullin's other grounds for dismissal of the Indictment.

With the utmost admiration for my distinguished colleagues, I therefore dissent.